## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

LARRY B. CATLETT, SR.,

        Plaintiff,

    v.

ATLANTIC CAPES FISHERIES, INC., *et al.*,

        Defendants.

No. 1:23-cv-1941

**OPINION**

---

**<u>APPEARANCES</u>**:

Joseph Fattorusso, II
Sullivan Papain Block McManus Coffinas & Cannavo PC
120 Broadway, 27th Floor
New York, NY 10271

Nicole Vera
Hofmann & Schweitzer
212 West 35th Street, 12th Floor
New York, NY 10001

Paul T. Hofmann
Hofmann & Schweitzer
1130 Route 202 South, Suite A7
Raritan, NJ 08869

    *On behalf of Plaintiff.*

Brian McEwing
Reeves McEwing LLP
10 Andrews Lane, P.O. Box 599
Dorchester, NJ 08316

Mary Reeves
REEVES MCEWING LLP
1004 S. Front Street
Philadelphia, PA 19147

    *On behalf of Defendants.*

**O'HEARN, District Judge.**

This matter comes before the Court on a Motion for Summary Judgment ("Motion") by Defendants Atlantic Capes Fisheries, Inc. ("ACF"), ACF Salt Oyster Company, LLC ("Salt Oyster"),[1] and F/V Vantage ("Vantage"),[2] (collectively, "Defendants"). (ECF No. 37). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, Defendants' Motion is **DENIED** in its entirety.

## I.    BACKGROUND[3]

Plaintiff Larry B. Catlett, Sr. ("Plaintiff") is a commercial fisherman who began oystering at the age of seventeen. (Defs. SOMF, ECF No. 37-2 ¶ 1). In 2015, he began experiencing back pain for which he sought treatment. (*Id.* at ¶ 2). In the same year, he underwent an MRI which reported degenerative changes in the lower portion of his back. (*Id.* at ¶ 3).

In 2018, Plaintiff became employed by Salt Oyster as a fisherman. (*Id.* at ¶ 8). During his employment with Salt Oyster, he worked aboard the Vantage on equipment referred to as sleds with his crewmates Captain Sean Dunlevy and Jeffrey Errickson. (Pl. SOMF, ECF No. 46-1 ¶ 3).

---

[1] This defendant is incorrectly identified in the Complaint as "Cape May Salt Oyster Company, Inc." and "Cape May Salt Oyster Company." (Compl., ECF No. 1 ¶¶ 7–8; Motion, ECF No. 37-1 at 5).

[2] This defendant is incorrectly identified in the Complaint as "Fishing Vessel Advantage." (Compl., ECF No. 1 ¶ 13; Motion, ECF No. 37-1 at 5).

[3] The facts set forth herein are undisputed unless otherwise noted.

Typically, there was a third deckhand present on the vessel but the individual who filled that position frequently changed. (*Id.*). The sleds were used to grow commercial oysters. (*Id.* at ¶ 5). Each sled contained at least two to three wheels[4] which held hexcyls where the oysters were placed to grow. (*Id.*). Once the sleds were ready to be placed offshore, the Vantage would transport and place them in a designated area. (*Id.* at ¶ 6). After several weeks, the Vantage would return to hoist the sleds aboard for maintenance and harvesting. (*Id.* at ¶¶ 7, 9).

During his employment with ACF, the parties agree that Plaintiff was referred to as the "deck boss" but disagree as to what, if any, significance that has with respect to this case. (Defs. SOMF, ECF No. 37-2 ¶ 13). Plaintiff alleges this was merely a title given to him by Captain Dunlevy and no such official position existed. (Pl. SOMF, ECF No. 46-1 ¶ 4). Defendants allege that as deck boss Plaintiff was essentially a supervisor and permitted to assign various tasks to the other crewmembers on the vessel. (Defs. SOMF, ECF No. 37-2 ¶ 14). However, according to Plaintiff, he was still expected to work alongside them. (Pl. SOMF, ECF No. 46-1 ¶ 4).

Plaintiff has had a history of back pain. In June 2020, Plaintiff presented to Mid-Atlantic Pain Specialists complaining of constant low back and right leg pain, and was prescribed Percocet. (Defs. SOMF, ECF No. 37-2 ¶¶ 44–45). From June 2020 to November 2020, he visited Mid-Atlantic Pain Specialists on a monthly basis to obtain refills of Percocet. (*Id.* at ¶ 46). On August 3, 2021, Mid-Atlantic Pain Specialists terminated its patient relationship for "breach of contract and non-compliance" because Plaintiff tested positive for Hydrocodone, which the medical center had not prescribed, in June 2020, June 2021, and July 2021. (*Id.* at ¶ 54). Later that month, Plaintiff began pain management treatment at Relievus Advanced Spine and Pain ("Relievus"). (Pl. SOMF,

---

[4] While the parties use the terms "wheel" and "drum" interchangeably, the former will be used herein for consistency.

ECF No. 46-1 ¶ 52). From August 2021 to August 2, 2022, there was no evidence of non-compliance or Plaintiff taking prescription medication that was not prescribed by Relievus. (*Id.*). In September 2021, Plaintiff underwent another MRI which reported "a finding of [m]ultilevel disc disease and facet arthropathy with multilevel foraminal narrowing." (Defs. SOMF, ECF No. 37-2 ¶ 7).

On August 2, 2022, Plaintiff was working alongside Errickson and Paul Edmunds, the third deckhand that day, while Captain Dunlevy was in the wheelhouse. (Pl. SOMF, ECF No. 46-1 ¶ 21). At some point during the workday, Plaintiff alleges that he hurt his back while harvesting oysters from an ACF sled labeled "478" with Errickson and Edmunds. (*Id.* at ¶ 23). Plaintiff testified at his deposition that he was pulling hexcyls in and out of the wheel at the time he was injured. (Defs. SOMF, ECF No. 37-2 ¶ 16). However, in a later submitted certification, he describes being injured while pushing and pulling the wheel. (Pl. SOMF, ECF No. 46-1 ¶ 25). Defendants deny that Plaintiff suffered an injury. (Defs. Resp. to Pl. SOMF, ECF No. 48 ¶ 41). Plaintiff admitted that he took a Percocet before he began working that day, and again around lunchtime. (Defs. SOMF, ECF No. 37-2 ¶ 29). He has not returned to work since the date of injury. (Pl. SOMF, ECF No. 46-1 ¶ 27).

## II.    <u>PROCEDURAL HISTORY</u>

On April 5, 2023, Plaintiff commenced this action asserting three causes of action: Jones Act claim (Count I), Unseaworthiness (Count II), and Maintenance and Cure (Count III). (ECF No. 1 ¶¶ 31–49). Plaintiff seeks maintenance and cure, compensatory and punitive damages, and attorneys' fees. (*Id.* at 9). Defendants filed the instant Motion on February 9, 2024. (ECF No. 37). Plaintiff filed his opposition on March 22, 2024, (ECF No. 45), to which Defendants replied on March 29, 2024, (ECF No. 48).

### III.    <u>JURISDICTION</u>

Federal courts have original jurisdiction in "[a]ny case of admiralty or maritime jurisdiction." 28 U.S.C. § 1331(1). "Admiralty jurisdiction is evoked if the alleged tort occurs on a vessel in navigable waters, and the actions giving rise to the alleged tort have the potential to disrupt maritime commerce and 'bear a significant relationship to traditional maritime activity.'" *Olmo v. Atl. City Parasail, LLC*, No. 13-4923, 2016 WL 1728964, at *7 (D.N.J. Apr. 28, 2016) (quoting *Sisson v. Ruby*, 497 U.S. 358, 364–66 (1990)). Here, the incident underlying Plaintiff's claims occurred on the Delaware Bay near the coast of the New Jersey in Cape May County while Plaintiff was aboard the F/V Vantage. (Compl., ECF No. 1 at ¶¶ 2, 4, 31, 35). Accordingly, jurisdiction over the subject matter of this action is conferred by 28 U.S.C. § 1333(1).

### IV.    <u>LEGAL STANDARD</u>

**Federal Rule of Civil Procedure 56**

Under Federal Rule of Civil Procedure 56, a court shall grant summary judgment when "a movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once met, the burden shifts to the nonmoving party to "go beyond the pleadings and by h[is] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations and citation omitted). To withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249–50). Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.

## V.    DISCUSSION

### A.  Defendants' Argument that the Court Should Strike Certifications Submitted by Plaintiff

Plaintiff submitted three certifications in support of his Opposition (the "Opposition") to Defendants' Motion: (1) his own certification ("Plaintiff's Certification"), (2) a certification from his partner, Gail Mauro ("Mauro Certification"), and (3) a certification from a neurosurgeon, Dr. Fernando Delasotta ("Dr. Delasotta Certification"). (ECF Nos. 45-2, 45-4, 45-5). Each certification provides details concerning when and how Plaintiff injured his back on August 2 and the causation thereof. (*Id.*). Defendants argue that the Court should strike certain paragraphs of the certifications (1) under the "sham affidavit" doctrine, (2) for lack of personal knowledge, and (3) because they

offer legal conclusions. (ECF No. 48-2 at 1–9).[5] This is a threshold issue that must be addressed to assess whether and to what extent there are disputed facts.

Under the "sham affidavit" doctrine, a court may disregard an affidavit submitted at the summary judgment stage when it is contradictory to the witness's prior deposition testimony and "indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). If an affidavit appears to be submitted for the sole purpose of defeating summary judgment, "it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." *Id.* However, not all contradictory affidavits are shams. *Id.* at 254 (citing *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004)). In instances where the record contains independent evidence, which bolsters the "questionable affidavit," courts typically decline to disregard the affidavit. *Id.* (quoting *Baer*, 392 F.3d at 625).

Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." And under Local Civil Rule 7.2(a), "[a]ffidavits, declarations, certifications and other documents of the type referenced in 28 U.S.C. § 1746 shall be restricted to statements of fact within the personal knowledge of the signatory." Further, "[l]egal arguments and summations in such documents will be disregarded by the Court and may subject the signatory to appropriate

---

[5]    The Court will not consider the "Summary of Defendants' Undisputed Material Facts Pursuant to Local Civil Rule 56.1(a)" (ECF No. 48-1) as there is no provision for such a "summary" under Local Civil Rule 56.1(a), and Defendants provide no explanation as to what the document purports to be or why the Court should consider it.

censure, sanctions or both." L. Civ. R. 7.2(a). Courts are permitted to disregard certifications, in their entirety or in part, that violate Local Civil Rule 7.2(a). *See Dreyer v. Altchem Env't Servs., Inc.*, No. 06-2393, 2007 WL 7186177, at *3 (D.N.J. Sept. 25, 2007) (explaining affidavits that are not founded upon personal knowledge are not to be considered).

### 1. Plaintiff's Certification (ECF No. 45-2)

In Paragraphs 2, 4, 5, 7, 8, 9, 13, 15, and 17 of Plaintiff's Certification, he alleges that he was injured while pushing and pulling on the wheel which he struggled to spin and align in order to remove the hexcyls.[6] (Pl. Cert., ECF No. 45-2, Ex. 2 ¶¶ 2, 4, 5, 7–9, 13, 15, 17). Defendants seek to strike the portions of Plaintiff's Certification which "allege problems related to rolling or rotating the [wheels] in order to access the hexcyls." (Reply, ECF No. 48-2 at 2–7). Defendants contend Plaintiff's Certification is a sham affidavit because during his deposition he "testified that he was injured removing the hexcyls from the [wheel]," and not while trying to rotate the wheel. (*Id.*). Specifically, during his deposition, Plaintiff testified as follows:

> Q: And what were you doing at the time that you claim that your back began to hurt on August 2, 2022?
>
> *           *           *
>
> A: Okay. My last day of work, yeah, we were bringing sleds in and unloading them, and as I was pulling them in and out, I twist and hurt my back.

(Pl. Dep., ECF No. 45-1, Ex. 1 at 44:12–14, 45:12–14).

*           *           *

---

[6] In Paragraph 4 of Plaintiff's Certification, in addition to spinning the wheel, he also states that he was "pulling and pushing on the trays to remove them" when he was injured. (ECF No. 45-2 ¶ 4).

Q: The job you say that you were doing when you were hurt was lifting these

hexcyls out of the [wheel], correct?

A: Yes.

(*Id.* at 108:5–8).[7]

*          *          *

Q: So what kind of - - so what happened - - explain to us what happened, when

you were trying to get that [hexcyl] out, and how you were injured?

A: I was pushing and pulling, and each side, too, will fall on top of it, the weight

of it, and you gotta pull and tug and turn to try to get it out, because the opening

is not that big, and when I did, I hurt my back.

(*Id.* at 117:25–118:7).

While Defendants are correct that during his deposition, Plaintiff testified he was injured

while attempting to remove one of the hexcyls, the question is whether Plaintiff's testimony is so

different from, and contradictory to, his now submitted certification. *See Waskiewicz v. Kohl's

Dep't Stores, Inc.*, No. 20-7314, 2023 WL 3932807, at *4 (D.N.J. June 9, 2023) (citing

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 210 (3d Cir. 2022)). The Court finds that it is

not. Rather, the facts set forth in Plaintiff's Certification amplify his deposition testimony and

indeed are consistent with the initial statement made by him in the incident report completed

around the time of the accident (the "August 9 Incident Report"). (Motion, ECF No. 37-12; ECF

No. 45-2, Ex. 2A at 1). In the August 9 Incident Report, Plaintiff states that he injured his back

---

[7] The Court notes that this was an objectionable question as it is leading, but there was no objection as to form at the time of the deposition and, thus, any such objection is waived. FED. R. CIV. P. 32 (d)(3)(B).

and left shoulder around 1 p.m. while pushing and pulling wheels which "would not turn." (*Id.*). Defendants were clearly aware of Plaintiff's prior statement regarding the wheel at the time of his deposition, yet asked no questions to attempt to clarify or reconcile his initial statement in the incident report with that made during his deposition. Considering the record as a whole, Plaintiff's Certification is not a sham affidavit. *Baer*, 392 F.3d at 626 ("[Plaintiff's] ability to point to evidence in the record that corroborates his later affidavit alleviates the concern that he merely filed an erroneous certification out of desperation to avoid summary judgment."). Any purported inconsistencies by Plaintiff as to how he injured himself is an issue of credibility and fact to be determined by a jury.

However, certain paragraphs of Plaintiff's Certification should be stricken as they are either not supported by personal knowledge or improperly offer legal and/or expert conclusions. Paragraphs 5 through 9 merely reiterate statements by Plaintiff's coworkers made in incident reports or deposition testimony and is improper. (ECF No. 45-2, Ex. 2 ¶¶ 5–9). Paragraph 10 attempts to attest as to the knowledge that Salt Oyster management had regarding the difficulty its employees faced when rolling the wheel but fails to include an explanation as to how Plaintiff became aware of this fact. (*Id.* at ¶ 10). As to Paragraph 13, to the extent Plaintiff attempts to attest as to what Errickson observed when Plaintiff injured himself, he cannot do so as he lacks personal knowledge. (*Id.* at ¶ 13); FED. R. EVID. 602. In short, the basis for Plaintiff's knowledge as to these facts is unstated.

In Paragraph 14, as phrased, Plaintiff makes a legal conclusion and/or attempts to offer an expert opinion that to make his job safer "the company should have installed a device or devices to hold the [wheel] back from rotating back on [him]." (ECF No. 45-2, Ex. 2 ¶ 14). In Paragraph 15, Plaintiff again makes a legal conclusion and/or attempts to offer an expert opinion, that "[i]f

some sort of hold back device had been installed on the [wheel] . . . [he] would not have suffered exacerbation and aggravation and new injury to [his] back." (*Id.* at ¶ 15). In Paragraph 16, Plaintiff attempts to assert an expert medical opinion as to causation by stating that "[t]he incident on August 2, 2022 is the cause for why [he] can no longer work." (*Id.* at ¶ 16). And in Paragraph 18, Plaintiff attempts to make an expert medical opinion as to the type of medical care he requires. (*Id.* at ¶ 18). Thus, these paragraphs will be disregarded.

For all these reasons, Plaintiff's Certification is not a sham affidavit, but Paragraphs 5 through 10, 14, 15, and 18 will be stricken in their entirety and the assertions as to medical causation in Paragraphs 13 and16 will not be considered by the Court.

## 2. Mauro Certification (ECF No. 45-4)

Defendants contend Paragraphs 1, 3, and 4 of Mauro's Certification should be stricken because they contradict her "sworn deposition testimony and the plain language of her text messages." (Reply, ECF No. 48-2 at 7–8). Mauro's Certification quotes a text message she sent to Captain Dunlevy on August 3, 2022, which states Plaintiff's back is "[r]eally bad today, actually since yesterday morning." (Mauro Cert., Ex. 45-4, Ex. 4 ¶ 2). Mauro's Certification explains that her text message was intended to inform Captain Dunlevy that Plaintiff would not be coming into work due to the "back injury" he suffered on August 2. (*Id.* at ¶¶ 1, 3–4). Defendants' claim that this is a sham affidavit lacks merit.

First, Defendants' claim that Mauro's Certification is "simply not true" is a credibility determination for the jury. (Reply, ECF No. 48-2 at 7). More importantly, Mauro was never asked about her text message during her deposition and thus her certification repeating its contents and explaining its intended meaning cannot possibly contradict her prior testimony. Further, Mauro makes clear at numerous points in her deposition that while Plaintiff had pre-existing back pain,

he was in "excruciating" pain upon his return from work on the date of the incident. (Mauro Dep., ECF No. 37-7, Ex. 3 at 71). Defendants' claim that she testified at her deposition that Plaintiff never told her about the incident is plainly belied by the record. For example, in response to being asked "What did he say he was doing," she testified "[s]leds were being pulled in. It's what they use to plant oysters with, and rotations . . ." and "that the sleds pretty much had done him in . . . the general work, the pushing, the pulling, the twisting, the turning, the bending, the picking up of heavy loads." (*Id*. at 72:12–16, 73:14–24). She then explained in more detail "[a]nd I said what happened. He said I brought it in, started unloading, started doing this and that, and all of a sudden he had pain that just went and it was excruciating." (*Id*. at 74:6–10). Further, there is no basis to strike the portion of her certification explaining that her message was intended to convey that Plaintiff had been in pain since he injured his back at work the prior morning, and not prior thereto. (Mauro Cert., Ex. 45-4, Ex. 4 ¶¶ 1, 4). Indeed, she was never asked during her deposition whether Plaintiff was experiencing any pain prior to leaving for work on the date of the incident or if she knew, or if Plaintiff had told her, at what time during the day he was injured. In short, the text message speaks for itself and whether Mauro's explanation as to its intended meaning is credible is a question for a jury. Thus, Mauro's Certification is not a sham affidavit and the Court will not strike it.

### 3. Dr. Delasotta Certification (ECF No. 45-5)

Defendants contend the statement in Paragraph 3 of Dr. Delasotta's Certification which reads "I have treated the [P]laintiff" should be stricken as he did not provide Plaintiff with any treatment. (Reply, ECF No. 48-2 at 8; Dr. Delasotta Cert., Ex. 45-5, Ex. 5 ¶ 3). Defendants further contend that Dr. Delasotta's Certification, notably Paragraph 5 which states "the need for treatment of Mr. Catlett's lumbar spine is casually [sic] related to work injuries Mr. Catlett sustained aboard

the F/V Vantage on August 2, 2022 in which a pre-existing condition was aggravated, exacerbated and accelerated and a new injury occurred," should be stricken as it is argumentative and attempts to create a question of fact to defeat summary judgment. (Reply, ECF No. 48-2 at 8; Dr. Delasotta Cert., Ex. 45-5, Ex. 5 ¶ 5). The Court disagrees.

Dr. Delasotta appears to be an expert witness retained by Plaintiff. (Hoffman Ltr. to Dr. Delasotta, ECF No. 48-8 at 2). And his office visit notes reflect that he examined Plaintiff on two separate occasions—December 12, 2022, and February 1, 2023. (ECF No. 45-5, Ex. 5 at 13–16, 19–22, 28–29). Following the December 12 visit, Dr. Delasotta recommended Plaintiff undergo an MRI and X-rays of his lumbar spine. (*Id.* at 16). On February 1, Plaintiff returned for a follow-up visit during which Dr. Delasotta discussed Plaintiff's MRI and X-ray results and developed a treatment plan. (*Id.* at 19–21). These facts suggest some treatment was provided by Dr. Delasotta as compared to the usual expert witness who merely reviews records, conducts a cursory examination and/or renders a report for litigation. Nevertheless, whether Dr. Delasotta provided treatment or is merely an expert witness is of no import with respect to this Motion or Defendants' argument that his Certification should be stricken as he has not been deposed in this matter.

As to Dr. Delasotta's causation opinion, the Court is perplexed by Defendants' argument that it should be disregarded. Critically, Defendants ignore that Dr. Delasotta has not provided sworn deposition testimony which is critical to assert the sham affidavit doctrine.[8] *Baer*, 392 F.3d at 624 ("[A] party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation

---

[8] There is a question as to whether the sham affidavit doctrine even applies to experts, however, some courts have applied it in cases where the expert has been deposed. *Irrevocable Tr. of Antonious v. Nike, Inc.*, No. 11-6327, 2016 WL 3176576, at *4 n.3 (D.N.J. June 2, 2016); *Lilja v. J&B Imps., Inc.*, No. 20-1158, 2022 WL 4094520, at *13–*14 (W.D. Pa. Aug. 17, 2022).

for the conflict.") (citing *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991)); *Jiminez*, 503 F.3d at 253.

More importantly, Dr. Delasotta's February 16, 2023 report specifically states that Plaintiff's "need for treatment of the lumbar spine is causally related to the work injury of 8/2/2022 in which a pre-existing condition was aggravated, exacerbated and accelerated." (ECF No. 45-5, Ex. 5 at 26). The opinion contained in his March 11, 2024 certification is essentially identical to his February 16, 2023 report. There is nothing improper nor any inconsistency and no basis to strike any part of his certification.

### B.  Plaintiff's Liability Claims

#### 1. Jones Act Claim (Count I)

Defendants argue summary judgment should be granted as to Plaintiff's Jones Act claim because Plaintiff cannot meet his burden to show a breach of duty and causation. (Motion, ECF No. 37-1 at 4). Plaintiff counters that questions of fact exist as to whether Defendants breached their duty by permitting the hexcyls to reach over 50 pounds in weight and failing to provide equipment which would "make the rotation of the [wheel] safe." (Opp., ECF No. 47 at 5–6). As to causation, Plaintiff argues that he has set forth sufficient facts from which a jury could find that he suffered an injury caused by the incident on August 2. (*Id.* at 6–8).

The Jones Act, 46 U.S.C. § 30104., *et seq.*, affords a seaman recovery for personal injuries suffered in the course of his employment. *Fasold v. Del. River & Bay Auth.*, 117 F. App'x 836, 837 (3d Cir. 2004). A plaintiff alleging a claim under the Jones Act must prove the elements of duty, breach, notice, and causation. *Walker v. Walker Bros. Fisheries, LLC*, No. 12-4223, 2014 WL 7179601, at *6 (D.N.J. Dec. 17, 2014) (citing *Brogan v. United N.Y. Sandy Hook Pilots' Ass'n, Inc.*, 213 F. Supp. 2d 432, 435 (D.N.J. 2002)). A plaintiff is entitled to recovery if the employer's

negligence, either in whole or in part, is the cause of the injury. *Id.* (citing *Ribitzki v. Canmar Reading & Bates, Ltd.*, 111 F.3d 658, 662 (9th Cir. 1997)). Liability attaches "where an owner has both notice of an unsafe condition and an opportunity to correct that condition." *Id.* (citing *Colburn v. Bunge Towing, Inc.*, 883 F.3d 372, 374 (5th Cir. 1976)).

Under the Jones Act, the standard of proof for causation is relaxed. *Brogan*, 213 F. Supp. 2d at 437. "Causation is satisfied if 'the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury. . . .'" *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 357 (3d Cir. 1998) (citing *Rogers v. Mo. Pac. R.R. Co.,* 352 U.S. 500, 506 (1957)). Presenting "even the slightest proof of causation" under this "featherweight causation standard" will permit a plaintiff's claim to survive summary judgment. *Ribitzki*, 111 F.3d at 664.

Here, there are disputed issues of material fact that preclude summary judgment. First, while both Plaintiff and Defendants agree that Plaintiff suffered from low back pain prior to the incident on August 2, Plaintiff contends that he experienced a new injury causally related to the incident that day (i.e., aggravation of his pre-existing low back pain). (Motion, ECF No. 37-1 at 5–6; Opp., ECF No. 47 at 7–8; Reply, ECF No. 48-2 at 9–10). Defendants dispute this contention and argue that the injury Plaintiff now complains of is solely related to his pre-existing condition and has no causal relationship to the incident. (*Id.*).

But Defendants provide a selective overview of Plaintiff's historical low back pain. (Motion, ECF No. 37-1 at 5–6). Defendants discuss Dr. Adam Zucconi's August 9, 2022 progress note regarding his evaluation of Plaintiff for lower back pain following the incident on August 2. (Premier Orthopaedic Assocs. Progress Note, ECF No. 37-9, Ex. 5 at 2). Dr. Zucconi's note states that Plaintiff had "minimal range of motion and constant sharp pain," and Plaintiff reported experiencing the highest level of pain on a 10-point scale. (*Id.*). Dr. Zucconi concluded that

15

Plaintiff's injury was "not causal to his work but chronic." (*Id.* at 4). Defendants also discuss the Relievus office notes which reflect that from May 2022 to July 2022 Plaintiff experienced lower back pain with an average pain level ranging between 7 and 9 on a 10-point scale. (Motion, ECF No. 37-1 at 6). Further, shortly after the August 2 incident (i.e., August 2022 and September 2022) Plaintiff reported experiencing an average pain level lower than prior to the incident (i.e., between 5 and 6 on a 10-point scale). (Motion, ECF No. 37-1 at 6–7 (citing Relievus Office Notes, ECF No. 37-10 at 22, 29)).

Nevertheless, Plaintiff points to evidence in the record which disputes Defendants' assertion that his back injury was wholly unrelated to the August 2 incident. First, Plaintiff cites other notes in the August 2022 and September 2022 Relievus records indicating Plaintiff reported "exacerbated and aggravated" lower back pain which had worsened since the date of the incident. (Pl. Resp. to Defs. SOMF, 46 at ¶¶ 24, 25 (citing Relievus Office Notes, ECF No. 37-10 at 22, 29)). Plaintiff also relies upon Dr. Delasotta's opinion that his need for treatment was causally related to the work injury in which a "pre-existing condition was aggravated, exacerbated and accelerated." (ECF No. 45-5, Ex. 5 at 26). In short, while Dr. Delasotta did not examine Plaintiff until nearly five months after the incident, and his opinions apparently differ from that of Dr. Zucconi, there is clearly a disputed issue of material fact as to whether Plaintiff suffered an injury causally related to the incident on August 2 which must be determined by a jury.

Second, Defendants contend that even if Plaintiff suffered an injury or exacerbation, his testimony that his employer played no role in causing the injury defeats his Jones Act claim. (Motion, ECF No. 37-1 at 7–8). Defendants further argue that because Plaintiff testified he injured himself pulling and pushing on a hexcyl, all other theories should be disregarded. (Reply, ECF No. 48-2 at 9). The Court has already determined that Plaintiff's Certification which states that he

injured himself while pushing and pulling a hexcyl, and while pushing and pulling on a wheel that would not turn, is not a sham affidavit. Further, there is additional evidence in the record, namely the August 9 Incident Report, which is consistent with Plaintiff's Certification, that creates a material issue of fact in this regard. (Pl. SOMF, ECF No. 46-1 ¶¶ 24–25; Pl. Cert., ECF No. 45-2, Ex. 2 ¶ 4; Pl. Incident Report, ECF No. 45-2, Ex. 2A at 1).

Third, Defendants argue that Plaintiff's claim that they were negligent because they failed to provide formal training on the manner in which work on the vessels was to be performed (e.g., how to safely harvest oysters and clean the hexcyls) is baseless because training was in fact provided. (Opp., ECF No. 47 at 8–9; Reply, ECF No. 48-2 at 10). Defendants allege that not only was Plaintiff trained on how to harvest oysters and clean the sleds, but he himself trained other crewmembers. (Reply, ECF No. 48-2 at 10). Plaintiff admitted during his deposition that he trained new crewmembers, but clearly denied that he personally received training during his employment. (Pl. SOMF, ECF No. 46-1 ¶ 2). Errickson also testified that he did not receive formal training when he began working for Defendants. (*Id.*). As such, there are genuine issues of material fact regarding whether and to what extent Plaintiff received formal training during his employment and whether Defendants were negligent in this regard.

For these reasons, Defendants' Motion as to Plaintiff's Jones Act claim (Count I) is **DENIED**.

## 2. Unseaworthiness Claim (Count II)

Defendants argue summary judgment should be granted as to Plaintiff's unseaworthiness claim because he testified there were no issues with the vessel or its equipment. (Motion, ECF No. 37-1 at 9–10; Reply, ECF No. 48-2 at 11–12). Defendants also argue that Plaintiff's own negligence was the cause of his injury as he improperly took pain medication while working and

failed to exercise his authority as "deck boss" to delegate the task of removing the hexcyls to his coworkers. (Motion, ECF No. 37-1 at 9–10; Reply, ECF No. 48-2 at 12–13). Plaintiff counters that the vessel was unseaworthy because: (1) the sled Plaintiff was working on at the time of the incident was "defective and in disrepair;" (2) Defendants failed to provide a safety device to prevent the wheel from rolling; (3) Defendants failed to properly train the crewmembers; and (4) there was an insufficient number of crewmembers on board to perform certain tasks. (Opp., ECF No. 47 at 15–17).

Traditionally, a vessel owner is "absolutely liable for any injury sustained by a [crewmember] in the course of his employment." *Brogan*, 213 F. Supp. 2d at 438. A vessel owner is required to "furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Id.* (quoting *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960)). This includes maintaining a vessel's equipment in proper operating condition. *Mahnich v. Southern S.S. Co.*, 321 U.S. 96, 104 (1944).

A vessel's state of unseaworthiness may arise from several conditions. For example, "[h]er gear might be defective, her appurtenances in disrepair, [or] her crew unfit." *Edynak v. Atl. Shipping Inc. Cie. Chambon Maclovia S.A.*, 562 F.2d 215, 222 (3d Cir. 1977) (quoting *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971)). Failure to properly maintain a vessel's equipment may also result in a vessel being found to be unseaworthy. *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1566 (11th Cir. 1985).

To support his unseaworthiness claim as to the defective nature of the sled, Plaintiff points to evidence in the record regarding the poor condition of the wheel and hexcyls. (Pl. SOMF, ECF

No. 46-1 ¶¶ 12, 14, 29, 33). During his deposition, he testified that the hexcyls were hard to handle as they would "fill with mud, guck, grime, dirt, and unwanted growth, which caused [them] to grow in weight," and would often "collapse and fall together" making them difficult to remove from the wheel. (*Id.* at ¶ 14). Further, he testified that the wheel would periodically become unbalanced and roll back due to its weight. (*Id.*). And he attests in his certification that despite requests to Defendants for "safety equipment," Defendants never installed a device to prevent the wheels from "rolling back." (*Id.* at ¶ 11).

Next, as noted above both Plaintiff and Errickson testified Defendants did not train them as to the manner in which work was to be performed (e.g., how to safely harvest the oysters and clean the hexcyls). (Pl. SOMF, ECF No. 46-1 ¶ 2).[9] A reasonable jury could find that the conditions of the equipment on the Vantage and/or lack of training, individually or collectively, created an unseaworthy condition which was causally related to Plaintiff's injury. *Sloan v. United States*, 603 F. Supp. 2d 798, 812 (E.D. Pa. 2009) (finding evidence that the defective condition of the ship elevator contributed to plaintiff's injury was sufficient to withstand summary judgment as to the unseaworthiness claim); *Eddy v. Mon River Towing, Inc.*, No. 02-1537, 2004 WL 2984355, at *4 (W.D. Pa. June 7, 2004) (concluding evidence that the defective radio "was not fit for its intended purpose . . . coupled with an inattentive pilot and inadequate crew" was sufficient to withstand summary judgment as to the unseaworthiness claim).

3. In summary, there is evidence in the record from which a jury could find that the vessel was unseaworthy. (Opp., ECF No. 47 at 15–16); *Brogan*, 213 F. Supp. 2d at 436–37. As such, Defendants' Motion as to Plaintiff's Unseaworthiness claim (Count II) is **DENIED**. <u>Maintenance and Cure Claim (Count III)</u>

---

[9]   While Plaintiff's Opposition argues that his testimony that Defendants were experiencing retention issues could establish a claim of unseaworthiness, nothing in the record supports a claim that there was understaffing on the date of the incident or that it played a role with respect to the incident. (Pl. SOMF, ECF No. 46-1 at ¶ 3).

Defendants argue they are entitled to summary judgment as to Plaintiff's Maintenance and Cure claim because: (1) he did not suffer an injury on August 2; (2) even if he did suffer an injury he failed to provide timely notice; (3) he committed misconduct by working aboard the vessel while violating United States Coast Guard regulations; (4) he committed misconduct by taking Percocet prior to and while performing his work tasks; and (5) he concealed his long-term back injury from Defendants. (Motion, ECF No. 37-1 at 11–17).

"Under general maritime law, a member of a ship's crew who was injured or became ill while serving onboard the vessel could recover 'maintenance and cure' from the shipowner/employer." *O'Connell v. Interocean Mgmt. Corp.*, 90 F.3d 82, 84 (3d Cir. 1996). "The right to maintenance and cure is an ancient right given to seamen by the maritime law." *Id.* (quoting *Jordine v. Walling*, 185 F.2d 662, 665 (3d Cir. 1950)). "Maintenance is the living allowance for a seaman while he is ashore recovering from injury or illness. Cure is payment of medical expenses incurred in treating the seaman's injury or illness." *Id.* (quoting *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 633 (3d Cir. 1990)). An employer is obligated to pay maintenance and cure "until the seaman has reached the point of maximum cure, that is until the seaman is cured or his condition is diagnosed as permanent and incurable." *Id.* (quoting *Barnes*, 900 F.2d at 633–34). Maintenance and cure "is a contractual obligation, which is independent of the shipowner's negligence or even the seaman's own negligence." *Id.* (citing *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730–31 (1943)). Typically, a claim for maintenance and cure presents a question of fact for a jury. *Bloom v. Weeks Marine, Inc.*, 225 F. Supp. 2d 1334, 1336 (M.D. Fla. Aug. 19, 2002). However, where there are no material facts at issue the claim may be decided by the Court upon by summary judgment. *Id.*

Only a seaman's "willful misconduct or deliberate misbehavior relieves the ship operator"

of the duty of maintenance and cure. *Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1080 (3d Cir. 1995) (citing *Barnes,* 900 F.2d at 633). Traditional examples of willful misconduct or deliberate misbehavior include injuries caused by intoxication and the use of illegal drugs. *Dailey v. Alcoa S.S. Co.*, 337 F.2d 611, 612 (5th Cir. 1964) (citing *Barlow v. Pan Atl. S.S. Corp.*, 101 F.2d 697, 698 (2d Cir. 1931)); *Bloomquist v. T.J. McCarthy S. S., Co.*, 263 F.2d 590, 593 (7th Cir. 1959); *Smith v. Isthmian Lines, Inc.*, 205 F. Supp. 954, 956 (N.D. Cal. 1962); *Silmon v. Can Do II, Inc.*, 89 F.3d 240, 243 (5th Cir. 1996).

Deliberate misbehavior also includes the intentional misrepresentation or concealment of facts related to a seaman's medical condition that are material to an employer's hiring decision. *Deisler*, 54 F.3d at 1080. Such an act may result in the forfeiture of a seaman's right to maintenance and cure if: "(1) the seaman intentionally misrepresented or concealed medical facts, (2) these medical facts were material to the employer's decision to hire him, and (3) there is a nexus between the medical facts and the injury at issue." *Welsh v. Maersk Line, Ltd.*, No. 06-2047, 2008 WL 4449578, at *2 (D.N.J. Sept. 29, 2008) (citing *Deisler*, 54 F.3d at 1080). The vessel owner bears the burden of proof as to willful misconduct and deliberate misbehavior. *Id.* (citing *Brown v. Parker Drilling Offshore Corp.,* 410 F.3d 166, 171 (5th Cir. 2005)). Thus, Defendants may only be relieved of their duty to provide maintenance and cure if they can show that Plaintiff engaged in willful misconduct or deliberate misbehavior which was the cause of his injury.

As to injury, as discussed in Section (IV)(B)(1), whether Plaintiff suffered an injury on August 2 is a question of fact which must be resolved by a jury and Defendants are not entitled to summary judgment as to Plaintiff's Maintenance and Cure claim on this basis.

As to timely notice, there are also disputed issues of fact in this regard. Plaintiff alleges that he informed his manager, Brian Harman, of the incident "shortly after it occurred." (Pl. SOMF,

ECF No. 46-1 ¶ 30). Plaintiff further alleges that Harman then delivered a blank incident report form to his home. (*Id.*). Defendants dispute that Harman received notice from Plaintiff shortly after the incident or that he delivered an incident report form to his home. (Defs. Resp. to Pl. SOMF, ECF No. 48 ¶ 30 (citing Harman Dep., ECF No. 48-5, Ex. 14 at 32:12–33:10, 34:22–35:9)). These are clearly disputed facts. All parties agree, however, that Plaintiff completed the incident report within a week of the incident. (ECF No. 45-2, Ex. 2A at 1). And Plaintiff's coworkers, Errickson and Edmunds, completed their incident reports within the same timeframe. (*Id.* at Ex. 2C at 1, Ex. 2E at 1). Yet, Defendants fail to cite any relevant case law or a company policy which dictates a specific timeframe within which Plaintiff was required to provide notice. (Motion, ECF No. 37-1 at 12–13). Rather, they merely allege that Plaintiff's six-day delay, presumably referring to the date that Plaintiff completed the Incident Report, should be considered willful misconduct. (*Id.*). But this too provides more than sufficient evidence to at least create an issue of fact, if not establish, that Defendants had sufficient notice. *See Brown v. Dravo Corp.*, 157 F. Supp. 265, 267 (W.D. Pa. Nov. 26, 1957) (commencement of lawsuit constituted sufficient notice of plaintiff's need for maintenance and cure). Defendants also cite no prejudice as a result of any alleged delay.

As to Defendants' contention that Plaintiff committed willful misconduct or deliberate misbehavior and violated United States Coast Guard regulations concerning use of dangerous drugs while working aboard the vessel, this argument also fails. (Motion, ECF No. 37-1 at 16–17; Reply, ECF No. 48-2 at 15–16). First, Defendants' attempt to rely upon 46 C.F.R. § 16.101, *et seq.* lacks merit. These regulations "prescribe the minimum standards, procedures, and means to be used *to test* for the use of dangerous drugs" by employers. 46 C.F.R. § 16.101 (emphasis added). Further, Plaintiff contends, and Defendants do not dispute, that 46 C.F.R. § 16.101, *et seq.* does not apply and the correct regulation related to testing protocol and requirements is 49 C.F.R. § 40,

*et seq.* which sets forth the manner in which and the means to be used for drug and alcohol testing required by the Department of Transportation. (Opp., ECF No. 47 at 24). Plaintiff further argues that 49 C.F.R. § 40, *et seq.* does not apply as the Vantage does not meet the minimum gross tonnage requirement, and notably Defendants concede that there was no requirement for Plaintiff to be drug tested under this regulation. (*Id.*; Reply, ECF No. 48-2 at 15). Frankly, the analysis and discussion of this issue by both parties was cursory at best. However, the Court need not even resolve the issue as to which, if any, regulation applies as Defendants do not in any way explain how regulations related to an employer's drug testing protocols have any relevance to its argument that Plaintiff engaged in misconduct.[10]

Further, there is no factual or legal relevance as to Defendants' arguments regarding Plaintiff's drug tests in 2020 and 2021 when he tested positive for Hydrocodone which had not been prescribed to him. This significantly predates the August 2, 2022 incident and there is no evidence of any failed drug test or non-compliance in 2022 or anytime near the time of the incident. (Defs. SOMF, ECF No. 37-2 ¶ 54; Pl. SOMF, ECF No. 46-1 ¶ 52).

As to Defendants' contention that Plaintiff committed misconduct by taking Percocet prior to and during work, Defendants fail to meet their burden to show that this admitted behavior constitutes willful misconduct sufficient to forfeit Plaintiff's right to maintenance and cure. Defendants argue Plaintiff's Percocet usage amounted to misconduct because it "masked his long-standing inability to perform the physical work his position required." (Motion, ECF No. 37-1 at 14; Reply, ECF No. 48-2 at 15). According to Defendants, the use of Percocet is the "causal link, because absent the masking of pain, Plaintiff would have never been in the position, or doing that

---

[10] Defendants do not even set forth any evidence that they had a drug testing program at the relevant time period.

task that he claimed injured his back." (Reply, ECF No. 48-2 at 15). Yet Defendants proffer no expert or medical opinion in this regard. They further point to no policy in place that precluded the use of medications while working or required disclosure thereof.

As to concealment, again Defendants fail to meet their burden to show willful or deliberate misconduct. As to the first prong, Defendants concede that they "did not ask any questions on [P]laintiff's application related to medical conditions that would have prevented him from working at ACF." (Pl. SOMF, ECF No. 46-1 ¶ 51). Plaintiff also contends that Defendants were aware of his back pain as he took pain medication during lunch in front of his coworkers (*Id.* at ¶¶ 44–46, 48). Further, Captain Dunlevy's incident report states that "[c]alling out due to backpain has been a common occurrence for [Plaintiff] for the last few years," which is corroborated by the statements in the incident reports of Plaintiff and his co-workers. (ECF No. 45-2, Exs. 2A–2C, 2E). As to the second prong, Defendants point to no facts in the record to support a finding that their hiring decision would have been different if Plaintiff revealed a pre-existing back injury at the time of hiring. *Deisler*, 54 F.3d at 1081 (concluding plaintiff remained entitled to his maintenance and cure despite his omission of his prior back injury on his application because defendant failed to meet its burden to prove the omission was material to its hiring decision). As to the third prong, the Court has already determined that there is a genuine issue of material fact as to what caused Plaintiff's injury. *See Welsh*, 2008 WL 4449578, at *4 (denying summary judgment because there was a genuine issue of material fact as to whether plaintiff's preexisting medical condition was causally related to the injury at issue in the lawsuit).

In summary, there are genuine issues of material fact and/or Defendants fail to meet their burden to show that Plaintiff engaged in willful misconduct or deliberate misbehavior sufficient to preclude maintenance and cure. As a result, Defendants' Motion as to Plaintiff's Maintenance and

Cure claim (Count III) is **DENIED**.

4. Primary Duty Doctrine

Defendants argue even if Plaintiff otherwise states a claim under the Jones Act and/or

Unseaworthiness, he is barred from recovering under the primary duty doctrine because his

negligence in failing to exercise his ability as "deck boss" to delegate certain tasks to his

coworkers, and by taking pain medication while aboard the vessel, were the sole causes of his

injury. (Motion, ECF No. 37-1 at 10–11, 14–15; Reply, 48-2 at 12–13, 15). Plaintiff counters that

the primary duty doctrine has been discredited and, to the extent it remains viable, it does not apply

here as there is no evidence that Plaintiff's actions were the sole cause of the dangerous conditions

aboard the vessel, that he could have controlled or eliminated the dangerous conditions, or that he

exercised his employment duties in an improper fashion. (Opp., ECF No. 47 at 17–19).

The primary duty doctrine prohibits "a seaman-employee . . . from [recovering against] his

employer for injuries caused by his own failure to perform a duty imposed on him by his

employment." *Walker*, 2014 WL 7179601, at *5 (quoting *Cal. Home Brands, Inc. v. Ferreira*, 871

F.2d 830, 836–37 (9th Cir. 1989)). In essence, "[t]he primary duty rule provides that a ship's

officer may not recover against his employer for negligence or unseaworthiness when there is no

other cause of the officer's injuries other than the officer's breach of his consciously assumed duty

to maintain safe conditions aboard the vessel." *Id.* (quoting *Wilson v. Mar. Overseas Corp.*, 150

F.3d 1, 11 (1st Cir. 1998)). An employer is relieved of liability under the primary duty doctrine

upon satisfaction of the following conditions: "(1) the seaman must have consciously assumed a

duty as a term of employment; (2) the dangerous condition that injured the seaman must have been

created by the seaman or could have been controlled or eliminated solely by the seaman in the

proper exercise of his or her employment duties; and (3) the seaman must have knowingly violated

a duty consciously assumed as a condition of employment." *Id.* (citing *N. Queen v. Kinnear*, 298 F.3d 1090, 1096 (9th Cir. 2002)). A court cannot make a legal determination as to whether the primary duty doctrine applies when there are factual discrepancies as to the nature of plaintiff's primary duty. *Juliussen v. Buchanan Marine, L.P.*, No. 08-1463, 2010 WL 86936, at *14 (S.D.N.Y. Jan. 7, 2010); *Eastham v. Sprickman*, No. 05-141, 2006 WL 889734, at *7 (W.D. Wash. Mar. 30, 2006) (denying summary judgment because defendants failed to establish as a matter of law that plaintiff knowingly violated a duty he assumed).

The primary duty doctrine was initially articulated in *Walker v. Lykes Bros. S.S. Co.*, 193 F.2d 772, 773 (2d Cir. 1952). However, the doctrine has since been significantly criticized, even in the Second Circuit where it originated, on the basis that it is "incompatible with the congressional mandate that contributory negligence and assumption of risk" and should not bar a seaman's recovery. *Dunbar v. Henry DuBois' Sons Co.*, 275 F.2d 304, 306 (2d Cir. 1960); *Newill v. Campbell Transp. Co., Inc.*, 87 F. Supp. 3d 766, 768 (W.D. Pa. 2015). "When the Jones Act was adopted in 1915, it extended to seamen the right of recovery against their employers that railroad employees already enjoyed. Congress made clear that contributory negligence does not bar recovery to railroad employees, and thus also cannot act as a bar to seaman." *Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031–32 (7th Cir. 1990).

The First, Fifth, Sixth, and Seventh Circuits have all held that the primary duty doctrine only applies where plaintiff's injury is solely caused by a breach of his employment duty. *Peymann v. Perini Corp.*, 507 F.2d 1318, 1322–23 (1st Cir. 1974); *Wilson*, 150 F.3d at 11; *Luwisch v. American Marine Corp.*, 956 F.3d 320, 328 (5th Cir. 2020); *Churchwell v. Bluegrass Marine, Inc.*, 444 F.3d 898, 909–10 (6th Cir. 2006); *Kelley,* 900 F.2d at 1031–32. Some circuits have narrowed the application of the doctrine. The Ninth Circuit narrowly applies the primary duty doctrine and

26

held it only applies where plaintiff's injury is solely caused by a breach of a specific duty for which he held the primary responsibility. *Reinhart v. U.S.*, 457 F.2d 151, 154–55 (9th Cir. 1972); *Cal. Home Brands, Inc.*, 871 F.2d at 836 n. 3. And the Fourth Circuit, further narrowing the defense, has held the primary duty doctrine is only applicable against a ship's captain and should not be applied against a seaman even if he were periodically permitted to "act as [a] captain." *Mason v. Lynch Bros. Co.*, 228 F.2d 709, 711–12 (4th Cir. 1956).

While the Third Circuit has not addressed the viability of the primary duty doctrine, lower courts within this Circuit have done so and have joined those courts that have criticized and/or substantially narrowed its application. *Newill*, 87 F. Supp. 3d at 768 ("[T]his Court will join the chorus in concluding that the primary duty rule is on its last legs, if not completely obsolete already."); *Walker*, 2014 WL 7179601 at *5 (denying defendant's summary judgment motion as there was a question of fact regarding whether plaintiff "knowingly violated a duty consciously assumed as a condition of [his] employment"). This Court agrees. Yet, the Court need not engage in a detailed analysis of whether the doctrine should apply and/or which version should be applied. The primary duty doctrine, to the extent it still exists and the Third Circuit were to adopt some variation of it, does not provide a defense as a matter of law in this case under any variation.

Even if some variation of the primary duty doctrine applies, Defendants are not entitled to summary judgment as, for the many reasons set forth herein, there are numerous disputed issues of material fact including disputed facts as to whether Plaintiff assumed a duty which should have been delegated to his coworkers and the meaning of him being referred to as a "deck boss." (Defs. SOMF, ECF No. 37-2 ¶ 17; Pl. SOMF, ECF No. 46-1 ¶ 4). Further, even Defendants do not argue Plaintiff assumed primary responsibility for any specific tasks. (ECF No. 37-1 at 11). Indeed, according to Plaintiff, while he had discretion to delegate certain duties he still was expected to

work alongside the other crewmembers. (Pl. SOMF, ECF No. 46-1 ¶ 4). Further, there are disputed facts as to the cause of any injury suffered by Plaintiff. Thus, even if he was negligent, the Court could not determine on a summary judgment motion that his negligence was the sole cause of any injury he suffered. Finally, no one argues that Plaintiff was captain. Defendants cannot meet their burden on any application of the doctrine.

Thus, Defendants' Motion as to the Primary Duty Doctrine is **DENIED**.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 37) is **DENIED** in its entirety. An appropriate Order accompanies this Opinion.

**CHRISTINE P. O'HEARN**
**United States District Judge**